

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOE AYEMEN MATHEWS,<br><br>*Defendant.* | Case No. 3:22-cr- 043<br><br>18 U.S.C. § 1349<br>Conspiracy to Commit<br>Wire Fraud and Bank Fraud<br>(Count 1)<br><br>Forfeiture Allegation |

**CRIMINAL INFORMATION**

THE UNITED STATES ATTORNEY CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Information, unless otherwise stated:

1. The defendant, MOE AYEMEN MATHEWS, resided in Glen Allen, Virginia, within the Eastern District of Virginia.

2. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disaster.

3. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees.

1

## *The Paycheck Protection Program*

4. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and was designed to provide emergency financial assistance to the millions of Americans suffering from the economic effects caused by the COVID-19 pandemic. The CARES Act established several new temporary programs and provided for the expansion of others to address the COVID-19 pandemic.

5. One source of relief provided by the CARES Act was the authorization of billions of dollars in forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP").

6. To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant had to state, among other things, the business': (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the eligibility of the business and the amount of money it may receive under the PPP. In addition, businesses applying for a PPP loan had to provide documentation showing their payroll expenses.

7. A PPP loan application had to be processed by a participating financial institution (the lender). If the PPP loan application was approved, the lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Lenders require that the information in the PPP loan applications be truthful, including information about the applicant's employees and payroll expenses, which is material to the lender's approval and the terms of the PPP loans.

8. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

9. PPP loan proceeds could only be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The proceeds of a PPP loan were not permitted to fund the borrower's ordinary day-to-day living expenses unrelated to the specified authorized expenses.

10. While this first draw PPP program ended on May 31, 2021, certain borrowers were eligible to apply for second draw PPP loans. Eligible borrowers included businesses that: had no more than 300 employees; which had previously received a PPP loan and would or had already used the full amount only for authorized uses; and which could demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. Second draw PPP loans were approved with the same general loan terms as the first draw PPP loans.

## Count One
(Conspiracy to Commit Wire Fraud and Bank Fraud)

11. From in or about April 2020, and continuing through in or about April 2021, in the Eastern District of Virginia, the defendant, MOE AYEMEN MATHEWS, knowingly and intentionally combined, conspired, confederated, and agreed with Co-Conspirator 1 to commit certain offenses against the United States, to wit:

    a. wire fraud, that is, to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute that scheme and artifice, transmitting or causing to be transmitted by means of wire communication in interstate commerce,

3

any writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b. bank fraud, that is, to knowingly execute and attempt to execute a scheme and artifice to defraud and to obtain money, funds, credits, assets, and securities owned by and under the custody and control of a financial institution as defined under Title 18, United States Code, Section 20, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

12. The purpose of this conspiracy was for the defendant and Co-Conspirator 1 to fraudulently obtain loan proceeds by submitting false and misleading PPP loan applications to financial institutions.

### *The Ways, Manner, and Means of the Conspiracy*

The ways, manner, and means by which the conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

13. Beginning in or about April 2020, and continuing through in or about April 2021, the defendant and Co-Conspirator 1 submitted and caused the submission of at least 38 fraudulent PPP loan applications to financial institutions, each of which was at that time a financial institution as that term is defined at Title 18, United States Code, Section 20, for various businesses the conspirators claimed to own and operate. In each of their applications, the defendant and Co-Conspirator 1 falsely certified that all the information therein, and in the supporting documents the conspirators also provided, was true and accurate.

14. Of the 38 fraudulent applications, 25 were first draw PPP loan applications. The defendant would sign the PPP Borrower Application forms as the authorized representative of the businesses, and he would represent that he and Co-Conspirator 1 were co-owners of the

4

businesses. The defendant would sign all the application materials, but for certain loans, Co-Conspirator 1 would also sign the application materials and promissory notes.

15. Although the specific misrepresentations and supporting documentation varied from application to application, each of the first draw PPP applications contained false statements, false certifications, and/or fabricated tax documents. These misrepresentations and fabrications included, but were not limited to, the following:

   a. The conspirators falsely represented the average monthly payroll and the number of employees working for their purported businesses. The conspirators willfully fabricated or inflated these figures to mislead the financial institutions that were reviewing their loan applications, and to fraudulently inflate the amount of loan proceeds the conspirators could receive for that particular business.

   b. The conspirators falsely certified that the loan proceeds would be used solely for business-related purposes, when, as they knew at the time, the conspirators also intended to use the funds for unauthorized personal expenses and bills, not just payroll and other approved business expenditures.

   c. In support of the applications, the conspirators routinely submitted fabricated Internal Revenue Service Form 941s that purported to substantiate the monthly payroll expenses and employee counts claimed in the applications.

16. For example, on or about April 3, 2020, the defendant submitted to a financial institution a first draw PPP application for Fresh Start Affordable Housing Inc., a business he claimed to own and operate with Co-Conspirator 1. On this application, the defendant falsely represented that the business' average monthly payroll was $19,823.34 and that the business had 6 employees, when, in truth and in fact, as the conspirators well knew, the business had no payroll or employees. To substantiate the payroll expenses and employee count claimed on the application, the defendant submitted fabricated Internal Revenue Service Form 941s to deceive

the financial institution reviewing the loan application. Based on the deliberately false and fabricated information the defendant and Co-Conspirator 1 provided in their application, the financial institution approved the application and authorized a PPP loan for $49,500. The proceeds for this loan were disbursed to a bank account controlled by the conspirators on or about April 16, 2020.

17. Once the fraudulent applications were approved by the financial institutions, proceeds for the PPP loans would generally be disbursed to bank accounts in the names of the businesses the conspirators claimed to own and operate. Several of these bank accounts were opened by the conspirators shortly before or immediately after the conspirators submitted the fraudulent applications. In general, both the defendant and Co-Conspirator 1 were signatories on these bank accounts.

18. The defendant and Co-Conspirator 1 did not use the loan proceeds solely for approved expenditures as required by the program.

19. In total, for the fraudulent first draw PPP applications the conspirators submitted, the defendant and Co-Conspirator 1 received over $500,000 in fraudulent proceeds from the affected financial institutions.

20. It was also part of the conspiracy and scheme to defraud for the defendant and Co-Conspirator 1 to submit fraudulent second draw PPP applications to financial institutions. These applications were necessarily predicated on the fraudulently-obtained first draw PPP loans the conspirators had applied for and received for their purported businesses, as one of the requirements for receiving a second draw PPP loan was that the business in question had previously been approved for and received a first draw PPP loan.

21. On the second draw PPP applications, the defendant and Co-Conspirator 1 would repeatedly make false certifications that they had used or would use the funds from their first draw PPP loans solely for eligible expenses under the program, when, as the defendant and Co-Conspirator 1 knew at the time, they had not and did not use those funds solely for eligible expenses. Moreover, when applying for second draw PPP loans, the defendant and Co-Conspirator 1 concealed that they had intentionally and knowingly submitted false and misleading first draw PPP applications.

22. Once the second-draw PPP loan proceeds were disbursed by the financial institutions, the defendant and Co-Conspirator 1 repeatedly and knowingly used the second draw PPP loan proceeds contrary to the program's requirements. For example, once the proceeds for a particular loan had been disbursed, the conspirators would regularly transfer and spend those proceeds on their other businesses that had not applied for that loan and who were not authorized to receive or use those loan proceeds.

23. In total, the conspirators submitted 13 fraudulent second draw PPP applications, receiving over $350,000 in loan proceeds.

24. As a result of this conspiracy, the defendant and Co-Conspirator 1 fraudulently obtained money to which they were not entitled.

7

### *Wire Transmissions in Furtherance of the Conspiracy*

25. In furtherance of the above described conspiracy and scheme and artifice to defraud, and for the purpose of executing and attempting to execute the scheme and artifice, the defendant and Co-Conspirator 1 routinely caused wire transmissions in interstate commerce, including wirings conducted by the conspirators of electronic transfers of fraudulent PPP loan proceeds from bank accounts located outside the Commonwealth of Virginia into bank accounts maintained at financial institutions within the Eastern District of Virginia and controlled by the conspirators.

(In violation of Title 18, United States Code, Section 1349).

### **FORFEITURE ALLEGATION**

26. Pursuant to Rule 32.2(a) Fed. R. Crim. P., defendant, MOE AYEMEN MATHEWS, is hereby notified that upon conviction of the offense alleged in Count One of this Criminal Information, he shall forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such violation.

The property subject to forfeiture includes, but is not limited to, the following:

A sum of money of at least $1,100,004.18, which represents the proceeds of the offense charged and which shall be reduced to a money judgment against the defendant in favor of the United States.

If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, pursuant to 21 U.S.C. § 853(p).

(All in accordance with Title 18, United States Code, Section 982(a)(2)(A), and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: April 19, 2022     By: *[signature]*
Kashan K. Pathan
Assistant United States Attorney